**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| MARCO DODA, DODA USA, INC., DODA COSTRUZIONE MACCHINE AGRICOLE, DI DODA ALDO E C. SNC., | ) ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 17-604-CFC-SRF |
| v. | ) ) | **JURY TRIAL DEMANDED** |
| WASTE MANAGEMENT, INC., WM INTELLECTUAL PROPERTY HOLDINGS, LLC, WASTE MANAGEMENT NATIONAL SERVICE, INC., AND JAMES L. DENSON, JR., | ) ) ) ) ) ) | |
| Defendants. | ) | |

**SECOND AMENDED COMPLAINT**

For their Second Amended Complaint against Defendants Waste Management, Inc., WM

Intellectual Property Holdings, LLC, Waste Management National Services, Inc., and James L.

Denson, Jr., Plaintiffs Marco Doda, DODA USA, Inc., and DODA COSTRUZIONE

MACCHINE AGRICOLE, di Doda Aldo e C. snc, state and allege as follows:

**PARTIES, JURISDICTION AND VENUE**

1.      Plaintiff Marco Doda is a citizen and resident of the Italian Republic.

2.      Plaintiff DODA USA, Inc. ("DODA USA") is a Minnesota corporation with its

principal executive office address located at 225 16th Street South, St. James, Minnesota 56081.

3.      Plaintiff DODA COSTRUZIONE MACCHINE AGRICOLE, di Doda Aldo e C.

snc, is an Italian corporation ("DODA Italy") with its principal office located at Str. Salmaso

Sante, 20, 46010 Curatone, Italy.

4.      Defendant Waste Management, Inc. ("WMI") is a Delaware corporation with a principal place of business at 1001 Fannin Street, Suite 4000, Houston, Texas 77002 and a registered agent address at 1209 Orange Street, Wilmington, Delaware 19801.

5.      WM Intellectual Property Holdings, LLC ("WMIP") is a Delaware limited liability company with a principal place of business at 1001 Fannin Street, Suite 4000, Houston, Texas 77002 and a registered agent address at 1209 Orange Street, Wilmington, Delaware 19801, and is a wholly owned subsidiary of WMI.

6.      Defendant Waste Management National Services, Inc. ("WMNS") is a Delaware corporation with a principal place of business at 1001 Fannin Street, Suite 4000, Houston, Texas 77002 and a registered agent address at 1209 Orange Street, Wilmington, Delaware 19801.

7.      Defendant James L. Denson Jr. ("Denson") is a citizen of the State of Oregon and at all times relevant to this matter was an agent and employee of WMNS.

8.      Jurisdiction is proper pursuant to 28 U.S.C. § 1332 as this case is between citizens of different states and citizens of a foreign state and the amount in controversy exceeds the jurisdictional requirement.

9.       Jurisdiction is proper pursuant to 28 U.S.C. § 1331 and § 1338(a) and because this case arises under the patent laws of the United States, 35 U.S.C § 256 and § 285.

10.     The Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 as the state law claims are so related to the claims falling within this Court's original jurisdiction that they form part of the same case or controversy under Article III of the Constitution of the United States.

11.     On information and belief, each Defendant played a role in the improper use and disclosure of Plaintiffs' intellectual property and each Defendant has or had some interest in the

patent, and patent applications at issue in this case, which improperly utilized Plaintiffs' intellectual property without identifying Marco Doda as the co-inventor of the patent.  As such, the claims against the Defendants share an aggregate of operative facts and common questions of fact sufficient to join them collectively in this case pursuant to 28 U.S.C. § 299.

12.     Venue is proper in this Court under 28 U.S.C. §§ 1391 and 1400.

## STATEMENT OF FACTS

13.     Plaintiff DODA Italy, which was founded in 1985, is an engineering and systems development firm that specializes in, among other things, designing, manufacturing and implementing biological waste separator systems which separate organic waste for a variety of applications.

14.     DODA USA is a Minnesota corporation that was incorporated in 2007 and markets DODA Italy's products and services in the United States and assists its customers with design, operation and implementation support services.

15.     Marco Doda is a principal of DODA Italy and DODA USA, and is the chief engineer and inventor for the products and systems for those companies.  He is also the inventor of the intellectual property for the DODA Bio Separator system which forms the basis of this lawsuit as well as the patents obtained, and sought, by Defendants which utilize his inventions and intellectual property.

16.     On information and belief, Defendants WMI, WMIP and WMNS, are related companies which operate under the corporate organization commonly known in the marketplace as Waste Management.

I.      **Initial Business Dealings between the Parties.**

17.     Beginning in 2009, representatives of DODA Italy and DODA USA (collectively "DODA") and representatives of WMNS or its related entities, engaged in discussions regarding a business relationship between the parties whereby WMNS would purchase waste separator equipment and systems which were designed, planned, manufactured and serviced by DODA.

18.     Through the course of these discussions, WMNS proposed a potential relationship whereby DODA would be the exclusive supplier of these waste separator systems for Waste Management's various facilities in the United States.

19.     In November 2009, representatives of WMNS and WMI, including Denson and Tom Koutroulis ("Koutroulis"), traveled to Italy to meet in person with Marco Doda and other representatives of DODA.  During their visit, Denson and Koutroulis were invited to and ate dinner at the house of Ada Doda.  They also visited an operating food separation and bio gas plant designed by DODA utilizing the DODA equipment, and discussed the installation of the first DODA system into a Waste Management facility.

20.     Following the visit to Italy, on November 17, 2009, Koutroulis sent an email (the "November 17, 2009 email") to DODA thanking DODA for the tour of the DODA facility.  The email, on which Denson was copied, acknowledged meeting Marco Doda, discussing the DODA system, and touring the DODA facilities.  The November 17, 2009 email also stated the following:

> After viewing the process we need to discuss the potential of getting a system in place to pilot in Orange County.  We recognize the benefit of the equipment and its ability, but as mentioned during our conversations, California has many stringent regulations, especially in Orange County.  In order for us to consider a pilot we need to address the regulations that would prohibit the use of the equipment and processing the food waste stream.  Our goal is to implement a system in Orange County that can be duplicated company wide.  The thought is, if

4

the equipment works in Orange County, it will work any where [sic] in the company.

Let us know what the next steps would be to meet and discuss implementing a pilot system in Orange County.

21.     Thereafter, in late 2009 and early 2010, the discussions between the parties focused on the installation of a DODA-designed system in WMNS's Orange County facility and DODA began providing information, initial drawings, and specifications for a site-specific DODA system, including detailed notes regarding the specific application of DODA's existing equipment, systems, designs, processes, and methods, which would be installed in WMNS's Orange County facility.

22.     In early 2010, in response to an inquiry from Denson, DODA sent an email to Denson providing Denson with answers to questions posed by Denson relating to the design, process and method in Waste Management's Orange County facility.  For example, DODA provided answers to Denson regarding how much water is required for the Bio Separator to function, and highlighted for Denson that "[f]or some dry loads we can also bring back stored liquid we have already processed that will aid in the process."  DODA also developed and drafted an initial series of diagrams of the bio separator system it proposed to install in the Orange County facility and on February 11, 2010 sent those diagrams directly to Denson (the "February 11 Diagrams").

23.     The February 11 Diagrams set out in detail DODA's proprietary equipment and processes, and specifically diagrammed an organic waste processing system that, among other things, featured (i) a hopper configured to receive sorted organic waste having contaminants from one or more sources; (ii) a separator system in communication with the hopper and configured to receive the sorted organic waste from the hopper; (iii) a wash water liquid tank in

communication with the separator system and containing wash water; (iv) a product tank in communication with the separator system and configured to receive the sorted organic waste from the separator system, which has been processed by the separator system; and (v) a make-up product tank in communication with the separator system and configured to receive the sorted organic waste from the separator system.

24.     After further discussions between the parties, on May 13, 2010, DODA then developed and drafted a more detailed, modified diagram of a proprietary bio separator system for WMNS's consideration ("May 13, 2010 Diagram").  This diagram again contained detailed drawings and descriptions of DODA's proprietary equipment and processes.

**II.     2010 Purchase Agreement.**

25.     On May 27, 2010, DODA USA and USA Waste of California, the WMI subsidiary which operated the Orange County facility, entered into an agreement whereby USA Waste of California agreed to purchase equipment from DODA related to source-separated food waste processing for the Orange County solid waste transfer facility for purposes of converting solid waste to feed stock which could be further processed by an anaerobic digester.

26.     The stated purpose of the agreement was to purchase DODA equipment so it could be used on a trial basis to determine if that equipment would work properly to process and remove contaminants from food waste which would be suitable for anaerobic digestion at the Orange County digester facility.

27.     The agreement provided that DODA would receive an initial payment of 50% of the purchase price for the equipment it designed, manufactured, and delivered to USA Waste of California and the remaining 50% upon successful completion of the trial.

28.     The agreement further provided that, if DODA's equipment was successful during the trial period, WMNS had the option to request a proposal from DODA regarding a national or regional supply agreement for the purchase or lease of DODA equipment on an exclusive basis.

29.     DODA subsequently finalized its design, manufactured the bio separator system, and delivered the required equipment to the Orange County facility.  The equipment performed as agreed during the trial period.

30.     Upon successful completion of the trial in Orange County, the parties engaged in further discussions regarding a more widespread application of DODA proprietary systems and processes in WMNS facilities and further purchases of equipment by WMNS.

**III.     2010 Mutual Nondisclosure Agreement.**

31.     As part of these negotiations, the parties contemplated exchanging further proprietary information and the need for a formal non-disclosure agreement became increasingly apparent.

32.     On December 9, 2010, after negotiations between DODA USA and WMNS, on behalf of itself and its "corporate affiliates and their respective operating divisions," entered into a Mutual Non-Disclosure Agreement with DODA USA ("2010 NDA").

33.     Section 1 of the 2010 NDA provides:

The Parties to this Agreement … wish to explore a potential business opportunity of mutual interest, and in connection with this opportunity, each Party has disclosed or may disclose to the other Party certain confidential or proprietary technical and business information which the disclosing Party desires the receiving Party to treat as confidential.

34.     Confidential Information under the 2010 NDA includes, with certain exceptions, the following:

… information disclosed by any Party to the other Parties, either directly or indirectly, in writing, orally, or by inspection of tangible objects (including

without limitation documents, prototypes, samples, plant, and equipment), which is designated as "Confidential," "Proprietary" or some similar designation.

35.     Excluded from the definition of Confidential Information was information that was already publicly known prior to disclosure, made public by the disclosing party after disclosure, was already in the possession of the receiving party, was properly obtained through some other third party, or was independently developed by the receiving party without reference to the Confidential Information of the disclosing party.

36.     Pursuant to Section 3 of the 2010 NDA, the Parties agreed not to "use any Confidential Information of the other Parties for any purpose except to evaluate and engage in discussions concerning a potential business relationship" and "not to disclose any Confidential Information of the other Party to third parties … [or] reverse engineer, disassemble, or decompile any prototypes, software, or other tangible objects which embody any other Party's Confidential Information.…"

37.     The parties to the 2010 NDA also agreed to "take reasonable measures to protect the secrecy of and avoid disclosure and unauthorized use of the Confidential Information of the other Parties," and that "[a]ll documents and other tangible objects containing or representing Confidential Information which have been disclosed by any Party to the other Parties, and all copies thereof which are in the possession of another Party, shall be and remain the property of the disclosing Party.…"

38.     The 2010 NDA also specifically provided that:

Nothing in this Agreement is intended to grant any rights to any Party under any patent, mask work right, copyright, trademark, trade secret, or other intellectual property right of another Party, nor shall this Agreement grant any Party any rights in or to the Confidential Information of another Party except as expressly set forth herein.

39.    The 2010 NDA is binding on all parties thereto, as well as "their successors and assigns," and the obligations of the parties were binding "until such time as all Confidential Information of the Party disclosed hereunder becomes publicly known and made generally available through no action or inaction of the receiving Party."

40.    Finally, by its terms, the 2010 NDA contained "the entire Agreement between the Parties with respect to the subject matter hereof, and no Party shall have any obligation, express or implied by law, with respect to trade secret or proprietary information of the other Parties except as set forth herein."

41.    After entering into the 2010 NDA, on December 31, 2010, DODA USA and WMNS entered into a non-binding letter of intent to explore the purchase of additional DODA equipment for use in California and throughout North America by WMNS or its subsidiaries or affiliates ("2010 LOI").

IV.    **2010 Letter of Intent and Further Exchange of Proprietary Information.**

42.    As part of the 2010 LOI, DODA agreed for a period of 45 days not to sell or market its products to any other waste processing, collection, hauling or disposal facility or organization besides WMNS.

43.    The 2010 LOI specifically referenced the parties to the 2010 NDA and acknowledged that information shared pursuant to the 2010 LOI could constitute Confidential Information which was subject to the restrictions of the 2010 NDA.

44.    With these agreements in place, DODA and WMNS continued their discussions regarding an exclusive relationship whereby DODA would design and manufacture proprietary equipment and processes to be used in WMNS facilities.

45.     DODA and WMNS had also been in discussions with a third party called Organic Resources Management, Inc. ("ORMI"), a Canadian company, regarding a potential joint venture whereby DODA would sell its equipment and processes on an exclusive basis to WMNS and ORMI in North America.

46.     On January 3, 2011, ORMI obtained a legal opinion from a Houston area law firm relating to a "bio-separator" technology referred to as the "DODA process" which concluded that process would not infringe on an existing patent.

47.     On April 12, 2011, WMNS sent a letter to DODA USA and ORMI indicating that it was interested "in working with both DODA and ORMI to explore potential business opportunities that are beneficial to all three parties (the "2011 LOI").  In the 2011 LOI, WMNS also indicated that it wanted to further discuss and evaluate the possibility of a potential joint business arrangement for collection and processing of food waste "to create a slurry product used in the production of methane gas for beneficial uses."

48.     In the 2011 LOI, WMNS stated that it anticipated "obtaining waste industry exclusivity for the purchase and installation of DODA processing units used to process food waste … [and] continuing to develop food waste processing processes and techniques utilizing DODA equipment to produce a slurry that can be blended or otherwise modified and managed in a manner that creates consistent slurry product that is optimized for utilization of waste water treatment, agricultural and/or other digesters, for the purposes of maximizing the production of methane gas within the digesters."

49.     The 2011 LOI further provided that "[a]ny intellectual property developed through a collaboration of two or more of the parties shall be owned jointly by the collaborating parities" [sic].

50.    The 2011 LOI was signed by WMNS, but was not signed by DODA.

51.    Pursuant to the 2010 NDA and the 2010 LOI, DODA and WMNS continued to discuss and negotiate a potential exclusive arrangement for the sale of DODA equipment throughout 2011.

52.    As part of these discussions, and pursuant to the 2010 NDA, DODA provided WMNS with additional confidential and proprietary information about its equipment, designs, processes and inventions.  In addition, on May 26, 2011, DODA sent to Denson another diagram of a proprietary bio separator system for WMNS's consideration ("May 26, 2011 Diagram"). This diagram again contained detailed drawings and descriptions of DODA's proprietary equipment and processes.

## V.    Waste Management Secretly Applies for a Patent Containing Proprietary DODA Information.

53.    During the pendency of ongoing discussions between DODA and WMNS regarding an exclusive, nationwide business relationship, and despite the 2010 NDA, representatives of WMNS had been secretly preparing a patent application which incorporated designs, information, equipment, and processes which were developed by Marco Doda and DODA and provided to WMNS on a confidential basis.

54.    On June 27, 2011, unbeknownst to DODA or its representatives who were in ongoing discussions with WMNS representatives regarding future business dealings, Denson and WMNS filed, or caused to be filed, with the U.S. Patent Office ("USPTO"), U.S. Patent Application No. 13/169,843, for a "System and Method for Converting Organic Waste into Methane and Other Useful Products" (the "'843 Patent Application").

55.    As part of the '843 Patent Application, Denson signed a Declaration for Patent Application on June 23, 2011 (the "Declaration") in which he stated as follows: "I believe I am

11

an original, first and joint inventor of the subject matter which is claimed and for which a patent is sought on the invention entitled:  SYSTEM AND METHOD FOR CONVERTING ORGANIC WASTE INTO METHANE AND OTHER USEFUL PRODUCTS."

56.     Despite stating that he was a joint inventor in the '843 Patent Application, directly above his signature on the '843 Patent Application Denson stated that he was the "sole or first" inventor, listed only himself as the inventor of the technology and process described therein, and made no mention of Marco Doda, DODA, or the contributions both had made in terms of providing the inventions and intellectual property which formed the basis of the proposed patent. As such, Denson's Declaration in effect declared to the USPTO that he was the original, first and **sole** inventor of the subject matter claimed in the '843 Patent Application.

57.     Denson further stated in his Declaration:  "I acknowledge the duty to disclose all information known to me that is material to patentability as defined in 37 CFR 1.56."

58.     Denson further acknowledged in his Declaration:   "I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the application of any patent issued thereon."

59.     In the patent specification submitted with the '843 Patent Application, Denson summarized the invention, in part, as follows:

Summary of the Invention

Accordingly, one aspect of the present invention is to provide an organic waste processing system to produce a slurry for the production of bio-gas, transportation

12

fuels and chemical products, and a residual solid.  The system includes (i) a hopper configured to receive sorted organic waste having contaminants from one or more sources, (ii) a separator system in communication with the hopper and configured to receive the sorted organic waste from the hopper and to remove at least a portion of the contaminants in the sorted organic waste, (iii) a complimentary liquid tank in communication with the separator system and containing complimentary liquids, (iv) a wash water liquid tank in communication with the separator system and containing wash water, (v) a product tank in communication with the separator system and configured to receive the sorted organic waste from the separator system, (vi) a make-up product tank in communication with the separator system and configured to receive the sorted organic waste from the separator system having low COD, (vii) a anaerobic digestor system configured to receive the sorted organic waste from the product tank, and (viii) a programmable logic controller.  The separator system includes a primary centrifugal separator.  At least a portion of the complimentary liquids from the complimentary liquid tank is periodically injected into the separator system upon request.  At least a portion of the wash water from the wash water tank is periodically injected into the separator system upon request.  At least a portion of the organic waste from the make-up product tank is periodically injected into the product tank upon request.  The anaerobic digestor system includes a flow meter, a control valve and an anaerobic digestor tank.  The control valve has an open and close position.  The programmable logic controller is configured to periodically inject organic waste into the anaerobic digestor tank to enhance anaerobic digestion.  The programmable logic controller is configured to monitor the flow meter and to open and close the control valve to inject the organic waste into the anaerobic digestor tank.

60.    Denson submitted fifteen (15) claims with the '843 Patent Application, including

the following:

1.    An organic waste processing system to produce to produce [sic] a slurry for the production of bio-gas, transportation fuels and chemical products, and a residual solid, comprising:

a hopper configured to receive sorted organic waste having contaminants from one or more sources;

a separator system in communication with the hopper and configured to receive the sorted organic waste from the hopper and to remove at least a portion of the contaminants in the sorted organic waste, wherein the separator system comprises a primary centrifugal separator;

a complimentary liquid tank in communication with the separator system and containing complimentary liquids, wherein at least a

portion of the complimentary liquids from the complimentary liquid tank is periodically injected into the separator system upon request;

a wash water liquid tank in communication with the separator system and containing wash water, wherein at least a portion of the wash water from the wash water tank is periodically injected into the separator system upon request;

a product tank in communication with the separator system and configured to receive the sorted organic waste from the separator system;

a make-up product tank in communication with the separator system and configured to receive the sorted organic waste from the separator system having low COD, wherein at least a portion of the organic waste from the make-up product tank is periodically injected into the product tank upon request;

an anaerobic digestor system configured to receive the sorted organic waste from the product tank, wherein the anaerobic digestor system comprises a flow meter, a control valve and an anaerobic digestor tank, wherein the control valve has an open and close position; and

a programmable logic controller, wherein the programmable logic controller is configured to periodically inject organic waste into the anaerobic digestor tank to enhance anaerobic digestion, wherein the programmable logic controller is configured to monitor the flow meter and to open and close the control valve to inject the organic waste into the anaerobic digestor tank.

61.     The '843 Patent Application contained and incorporated confidential and proprietary information developed and provided by DODA on a confidential basis, including but not limited to a diagram of the process described in the patent application which directly incorporated some or all of the diagrams provided by DODA to Denson and WMNS.

62.     In fact, most if not all of the concepts and information in the claims with the '843 Patent Application were derived directly from Marco Doda and DODA, as outlined in the communications and diagrams sent to Denson and WMNS by DODA.

14

63.     On information and belief, Denson assigned his interest in the '843 Patent Application to WMNS on or about July 6, 2011.

**VI.     The 2012 NDA.**

64.     DODA continued to negotiate with WMNS in good faith, and provide it with confidential information regarding its proprietary systems to aid in its use of the systems which were already purchased, and with the understanding that the information provided would be kept confidential by WMNS and its subsidiaries and affiliates and not improperly disclosed.

65.     During this period of time, WMNS continued to conceal its unauthorized use and disclosure of DODA's proprietary information in the '843 Patent Application, presumably in an effort to obtain further information from DODA and surreptitiously secure a patent for its sole benefit using proprietary information and intellectual property obtained from DODA under false pretenses.

66.     After further negotiations between the parties, and in what DODA believed was an effort to further secure the parties' relationship and provide additional protection to its confidential information, DODA USA and WMNS, as well as all of its subsidiaries and affiliated entities, entered into a second Non-Disclosure Agreement on April 13, 2012 (the "2012 NDA").

67.     The 2012 NDA's stated purpose was to facilitate the ongoing business relationship between the parties and acknowledged that "each Party has disclosed or may disclose to the other party certain confidential or proprietary technical and business information" which the parties wanted to remain confidential.

68.     The 2012 NDA defines Confidential Information, in pertinent part, as:

[A]ny and all information in whatever form … disclosed or furnished by or on behalf of any Party to the other Party, at any time (whether before or after the date of this Agreement) …, whether or not such information is designated as "Confidential," "Proprietary," or some other similar designation, including

without limitation … trade secrets, software programs, intellectual property, system designs, process designs, cad drawings, product designs … developments, inventions, processes, projections, products, plans, ideas, methods, machinery, pending projects and proposals, technical data, product and equipment designs or enhancements and other developments and techniques, and other confidential or proprietary information, whether patentable or copyrightable or not, and other information that is not generally known or readily ascertainable by other persons.

\*\*\*

Given the nature of previous and continuing Discussions between the Parties together with the complex nature of the Discussions, Confidential Information exchanged between the Parties prior to the execution of this Agreement will be governed by the terms and conditions of this Agreement.   The Parties acknowledge and agree that some Confidential Information exchanged between the Parties may not have been identified or marked as Confidential Information, but all information exchanged by the Parties shall be deemed to be Confidential Information even if not marked as such.

69.     Like its predecessor, the 2012 NDA restricts the unauthorized use or disclosure of

Confidential Information, which by its terms included all proprietary information provided by

DODA, and placed an obligation on the receiving party to keep such information confidential.

70.     The 2012 NDA also provides that:

Nothing in this Agreement is intended to grant any license or similar rights to any Party under any patent, mask work right, copyright, trademark, trade secret, or other intellectual property right of another Party, nor shall this Agreement grant any Party any license or similar rights in or to the Confidential Information of the another Party except as expressly set forth herein.

71.     As with the 2010 agreement, the 2012 NDA's term extends until such time as the

Confidential Information becomes publicly available "through no action or inaction of the

receiving Party."

72.     With respect to remedies, the 2012 NDA specifically provides as follows:

In any action to enforce the provisions of this Agreement, recipient Party shall … pay any and all costs and expenses incurred by disclosing Party to enforce the terms and conditions of this Agreement, including court costs and attorneys' fees.

73.     Finally, the 2012 NDA provides:

The Parties agree that:  (i) the Confidential Information of the disclosing Party and all goodwill associated with or symbolized by such Confidential Information are the property of the disclosing Party; (ii) no action by a disclosing Party shall be deemed to constitute or result in an assignment of any of the Confidential Information to recipient Party or the creation of any equitable or other interest herein or to grant the recipient Party the right to use the Confidential Information except as contemplated herein; and (iii) all legal rights in the Confidential Information, **including the right to patent the technology arising therefrom, shall belong exclusively to the disclosing Party**.

For the avoidance of doubt, holding tank mixing sequences and/or customization of DODA Equipment developed exclusively by Waste Management, or by DODA at the request of Waste Management, that may or may not incorporate DODA equipment, will remain confidential to Waste Management for the duration and in accordance with [the term of the agreement]  [emphasis added].

74.     Based upon the 2012 NDA, as well as the assurances provided by WMNS throughout the discussions between the companies, DODA was under the belief that WMNS and its subsidiaries and affiliated entities were honoring the propriety and confidentiality of DODA's information and were negotiating a potential exclusive equipment purchase arrangement in good faith.

75.     In reality, however, WMNS and Denson had already improperly used and disclosed DODA's confidential information in the '843 Patent Application, and had fraudulently taken credit for inventing proprietary DODA technology in its '843 Patent Application.

**VII.    Waste Management Obtains a Patent Using DODA's Intellectual Property.**

76.     Unbeknownst to DODA, without any disclosure from WMNS or any other Waste Management entity or employee, and despite the 2010 and 2012 NDAs, the '843 Patent Application was published on December 27, 2012.

17

77.    DODA was never made aware of the '843 Patent Application and WMNS actively and purposefully continued to conceal its existence from DODA through non-disclosure and continued promises of an exclusive business arrangement.

78.    The parties continued to engage in discussions and DODA continued to provide WMNS and its affiliated entities with confidential and proprietary information about its systems at WMNS's request.

79.    DODA also continued, and continues, to provide WMNS and/or its subsidiaries and affiliated entities with technical expertise and service for its existing DODA equipment.

80.    Unbeknownst to DODA, on January 6, 2015, U.S. Patent No. 8,926,841 was issued by the U.S. Patent Office based on the '843 Patent Application (the "'841 Patent").  The '841 Patent listed Denson as the sole inventor and WMNS as the assignee.  The '841 Patent contained proprietary information provided by DODA to Denson and WMNS pursuant to the 2010 and 2012 NDAs.  A copy of the '841 Patent is attached hereto as Exhibit 1.

81.    Claim 16 in the '841 Patent provides as follows:

16.    An organic waste processing system to produce to produce [sic] a slurry for the production of bio-gas, transportation fuels or chemical products, and a residual solid, comprising:

a hopper configured to receive sorted organic waste having contaminants from one or more sources;

a separator system in communication with the hopper and configured to receive the sorted organic waste from the hopper and to remove at least a portion of the contaminants in the sorted organic waste, wherein the separator system comprises a primary separator;

a wash water liquid tank in communication with the separator system and containing wash water, wherein at least a portion of the wash water from the wash water tank is periodically injected into the separator system upon request;

a product tank in communication with the separator system and

18

> configured to receive organic waste from the separator system,
> which has been processed by the separator system; and
>
> a make-up product tank in communication with the separator
> system and configured to receive the sorted organic waste from the
> separator system having low COD, wherein at least a portion of the
> organic waste from the make-up product tank is periodically
> injected into the product tank upon request.

82.     Denson derived Claim 16 from the information and diagrams provided by DODA and Marco Doda in 2009 through 2012, as outlined above.

83.     On information and belief, WMNS assigned its interest in the '841 Patent to WMI or about January 8, 2015.

84.     On information and belief, WMI assigned its interest in the '843 Patent Application to WMIP or about January 15, 2015.

85.     Despite WMNS's ongoing business relationship with DODA, its obligations under the 2010 and 2012 NDAs, including its affirmative representation in the 2012 NDA that "all legal rights in the Confidential Information, including the right to patent the technology arising therefrom, shall belong exclusively to the disclosing Party," WMNS was intentionally silent about, and did not disclose to DODA, the '843 Patent Application or the '841 Patent.

## VIII.   DODA Learns of The '841 Patent, Attempts to Resolve the Ownership Dispute and Enters into a Tolling Agreement.

86.     DODA did not learn of the issuance of the '841 Patent, or the fact that WMNS and Denson even made a patent application which relied on its inventions and intellectual property, until July 2016.

87.     Upon learning of the '841 Patent and examining its contents, DODA conferred with counsel and promptly sent a letter to Eric Myers, Director of Organics Recycling at WMNS demanding that WMNS amend the '841 Patent to include Marco Doda as a co-inventor on October 14, 2016.

88.     WMI and WMNS, through their counsel, responded on October 28, 2016 requesting additional information and promising a formal response by the end of November 2016.

89.     DODA, through counsel, provided the requested information on November 7, 2016.

90.     Despite receiving the requested information, however, WMI and WMNS failed to provide a formal response to DODA's demand until January 13, 2017.

91.     After receiving WMI and WMNS's response, DODA learned that WMNS or its affiliates had also previously filed additional patent applications which were derivative of, or relied upon, the same DODA intellectual property as was contained in the '841 Patent, without recognizing Marco Doda as a co-inventor of the same.

92.     DODA has requested information from WMI and WMNS regarding all such patents and patent applications, but they have refused to provide the same.

93.     One such patent application, U.S. Patent Application No. 15,435,021 (the "'021 Patent Application"), for a "System and Method for Converting Organic Waste into Methane and Other Useful Products" issued on November 26, 2019 as U.S. Patent No. 10,486,995 (the "'995 Patent"). The '021 Patent Application is a continuation of U.S. Patent Application No. 14/589,215, filed on January 5, 2015 and now abandoned, which is a continuation of the '843 Patent Application. The '995 Patent lists Denson as the sole inventor and WMIP as the assignee.

94.     The '995 Patent contains proprietary information provided by DODA to Denson and WMNS pursuant to the 2010 and 2012 NDAs. A copy of the '995 Patent is attached hereto as Exhibit 2. The '995 Patent is derivative of or relies upon the same DODA intellectual property as contained in the '841 Patent, but again does not recognize Marco Doda as a co-

inventor of the same.  The '995 Patent again relies on a diagram of the process which directly incorporates some or all of the diagrams provided by DODA to Denson and WMNS and its related entities.  Most if not all of the concepts and information in the claims with the '995 Patent were derived directly from Marco Doda and DODA, as outlined in the communications and diagrams sent to Denson and WMNS by DODA.

95.     Claim 1 of the '995 Patent provides as follows:

1. An organic waste processing system to produce a slurry for the production of bio-gas, transportation fuels or chemical products, and a residual solid, comprising:

a hopper configured to receive organic waste having contaminants including COD from one or more sources;

a separator system in communication with the hopper and configured to receive the organic waste from the hopper and to remove at least a portion of the contaminants in the organic waste, wherein the separator system comprises a primary separator;

a wash water liquid tank in communication with the separator system and containing wash water, wherein at least a portion of the wash water from the wash water tank is periodically injected into the separator system upon request;

a product tank in communication with the separator system and configured to receive organic waste from the separator system, which has been processed by the separator system; and

a make-up product tank in communication with the separator system and configured to receive the organic waste from the separator system having low COD, wherein at least a portion of the organic waste from the make-up product tank is periodically injected into the product tank upon request.

96.     Denson derived Claim 1 from the information and diagrams provided by DODA and Marco Doda in 2009 through 2012, as outlined above.

97.     The parties engaged in continued discussions regarding DODA's demand and, in order to facilitate those discussions, entered into a Tolling Agreement which tolled the running of any statutes of limitations or other defenses based on the passage of time.

98.     DODA and WMNS continue to have a contractual business relationship whereby DODA provides service and support to WMNS's existing DODA equipment.

99.     WMNS and, on information and belief, its subsidiaries and affiliates, continue to possess DODA's Confidential Information and proprietary information and, upon information and belief, continue to use and disclose that information in violation of the 2010 and 2012 NDAs.

100.    On information and belief, Defendants have derived, and continue to derive, substantial economic and non-economic benefits, including reputational benefits, from the '841 Patent, from derivative patents and patent applications therefrom, and from DODA's Confidential Information and proprietary information that, upon information and belief, they have used and disclosed in violation of the 2010 and 2012 NDAs.

101.    WMNS has refused repeated requests from DODA to add Marco Doda as a joint inventor in the '843 Patent Application or otherwise name him as a joint inventor on the '841 Patent or in subsequent patent applications which derived from the '841 Patent, including the '021 Patent Application that has issued as the '995 Patent.

102.    DODA USA has sold, and continues to sell, organic waste processing systems in the United States which contain (i) a hopper configured to receive sorted organic waste having contaminants from one or more sources; (ii) a separator system in communication with the hopper which is configured to receive the sorted organic waste from the hopper and to remove at least a portion of the contaminants in the sorted organic waste, wherein the separator system

comprises a primary separator; (iii) a wash water liquid tank in communication with the separator system and containing wash water, wherein at least a portion of the wash water from the wash water tank is periodically injected into the separator system upon request; (iv) a product tank in communication with the separator system and configured to receive organic waste from the separator system, which has been processed by the separator system; and (v) a make-up product tank in communication with the separator system and configured to receive the sorted organic waste from the separator system having low COD, wherein at least a portion of the organic waste from the make-up product tank is periodically injected into the product tank upon request.

## COUNT I

### Correction of Inventorship and Ownership of '841 Patent and Derivative Patents
### 35 U.S.C § 256
### (All Defendants)

103.    Plaintiffs incorporate herein by reference each of the above-outlined Paragraphs as if fully set forth herein.

104.    This is a lawsuit to correct the ownership of, and the inventors named in, the '841 Patent, and all derivative patents therefrom, including the '995 Patent, to include Marco Doda as a joint inventor.

105.    The '841 Patent incorporates, relies upon, and references intellectual property developed and invented by Marco Doda.

106.    Marco Doda contributed to the conception of one or more claims of the '841 Patent, including but not limited to, claim numbers 1, 2, 5, 6, 7, 8, 9, 10, 11, 12, 13, 16, 17, 18, 19, 20, 21, 22, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, and 38, and is a joint inventor of the '841 Patent.

107.     Plaintiffs requested that Defendants amend the '841 Patent to include Marco Doda as a joint inventor in the '843 Patent Application or otherwise name him as a joint inventor on the '841 Patent or in subsequent patent applications which derived from the '841 Patent, including the '021 Patent Application that issued as the '995 Patent, but Defendants refused.

108.     The '995 Patent, derived from the '841 Patent, likewise incorporates, relies on, and references intellectual property developed and invented by Marco Doda.

109.     Marco Doda contributed to the conception of one or more claims of the '995 Patent, including at least claim 1.

110.     There remains a good-faith, ongoing dispute regarding Marco Doda's contribution to the '841 Patent and the '995 Patent as an inventor.

111.     By failing to name Marco Doda as a joint inventor in the '843 Patent Application or otherwise name him as a joint inventor on the '841 Patent, Defendants violated 35 U.S.C. §§ 115 and 116, which require the identification of each inventor in the oath or declaration supporting a patent application.

112.     Defendants have also violated 35 U.S.C. §§ 115 and 116 by failing to identify Marco Doda as an inventor on subsequent patents which derived from the '841 Patent or otherwise incorporated or relied upon intellectual property, inventions, and processes invented, in whole or in part, by Marco Doda, including the '995 Patent.

113.     Without correction of the named inventors on the '841 Patent and subsequent patents, including the '995 Patent, pursuant to 35 U.S.C. § 256, Defendants' violations of 35 U.S.C. §§ 115 and 116 will continue unabated to the detriment of Marco Doda, Plaintiffs and the public at large.

114.    In addition, without correction, the Defendants will continue to improperly obtain and retain the benefits, both economic and non-economic, from their improper failure to add Marco Doda as a joint inventor in the '843 Patent Application or otherwise name him as a joint inventor on the '841 Patent or in subsequent patents which derived from the '841 Patent, including the '995 Patent.

115.    Marco Doda and Plaintiffs therefore request that this Court issue an order correcting the inventors named in the '841 Patent and any patents derived from the '841 Patent or which otherwise rely on or incorporate any invention made, in whole or in part, including the '995 Patent, to identify and list Marco Doda as joint inventor of the '841 Patent and the '995 Patent.

116.    In addition, since Marco Doda was a joint inventor of the '841 Patent and the '995 Patent, Marco Doda is also an owner of the '841 and '995 Patents and, as such, this Court should issue an order finding that he has an ownership interest in the '841 and '995 Patents.

117.    Defendants' failure to identify Marco Doda in the relevant patent documents, or otherwise name him as joint inventor of the '841 Patent and any subsequent patents, including the '995 Patent, was intentional, undertaken in bad faith, and occurred without any deceptive intent on Plaintiffs' part.

118.    Defendants intentionally concealed their application for, and obtaining of, the '841 Patent and subsequent patents, including the '995 Patent, and applied for the same using DODA's intellectual property in violation of the 2010 and 2012 NDAs.

119.    Defendants misrepresented its intentions of entering into a business relationship with DODA, and entered into nondisclosure agreements which it had no intention of honoring, in an effort to obtain confidential and proprietary information from DODA with the specific intent

to use that intellectual property, without DODA's approval or knowledge, to obtain a patent which incorrectly identified Denson as the sole inventor of the patent.

120.    Defendants have undertaken bad faith conduct relative to their obtaining the '841 Patent and the '995 Patent and intentional failure to identify Marco Doda as an inventor.

121.    This is an exceptional case which justifies an award of attorneys' fees in favor of Plaintiffs pursuant to 35 U.S.C. § 285 and Plaintiffs therefore request the same.

**COUNT II**

**Breach of Contract – 2010 NDA and 2012 NDA**
**(WMNS)**

122.    Plaintiffs incorporate herein by reference each of the above-outlined Paragraphs as if fully set forth herein.

123.    The 2010 NDA was a binding contract which, among other things, prohibited WMNS from disclosing and using confidential information provided by Plaintiffs.

124.    WMNS breached the 2010 NDA by disclosing and using confidential information provided by Plaintiffs, including without limitation, using confidential information provided by DODA to obtain the '841 Patent and make subsequent patent filings, including the '021 Patent Application that has issued as the '995 Patent.

125.    The 2012 NDA was a binding contract which, among other things, prohibited WMNS from disclosing and using confidential information provided by Plaintiffs.

126.    WMNS breached the 2012 NDA by disclosing and using confidential information provided by Plaintiffs, including without limitation, using confidential information provided by DODA to obtain the '841 Patent and make subsequent patent filings, including the '021 Patent Application that has issued as the '995 Patent.

26

127.    Plaintiffs have been damaged by WMNS's past and ongoing breaches of these binding contracts in an amount to be determined at trial.

128.    Plaintiffs are entitled to recover their reasonable costs and attorneys' fees incurred as a result of WMNS's breaches of the 2010 NDA and 2012 NDAs and demand the same as part of this lawsuit.

## COUNT III

### Breach of the Implied Covenant of Good Faith and Fair Dealing
### (WMNS)

129.    Plaintiffs incorporate herein by reference each of the above-outlined Paragraphs as if fully set forth herein.

130.    The 2010 NDA and 2012 NDAs were binding agreements.

131.    Implied in both the 2010 NDA and 2012 NDAs was an implied covenant of good faith and fair dealing which prohibited WMNS from acting arbitrarily or unreasonably, thereby frustrating the fruits of the bargain of those agreements which Plaintiffs reasonably expected.

132.    Plaintiffs reasonably expected under the terms of the 2010 NDA and 2012 NDAs that WMNS would not improperly use the confidential information produced by Plaintiffs pursuant to those agreements, including without limitation secretly using the information to secure a patent which relied upon that information and which identified WMNS's agent, James L. Denson, Jr., as the sole inventor of the patent, or otherwise attempted to harm and frustrate the business of Plaintiffs.

133.    Plaintiffs further reasonably expected that WMNS would deal fairly and honestly with them and not use false pretenses, misinformation and deception to induce Plaintiffs to enter into an agreement in an effort to obtain even more of Plaintiffs' proprietary information with the intent of misusing that information and/or using it to harm or impede Plaintiffs' business.

134.    As a direct and proximate result of WMNS's breach of the covenant of good faith and fair dealing, Plaintiffs have been damaged under the 2010 NDA and 2012 NDAs in an amount to be determined at trial, including all attorneys' fees recoverable by law or contract.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the Court enter judgment in favor of Plaintiffs and against Defendants, and enter an Order:

1.    Correcting the inventorship of U.S. Patent No. 8,926,841, as well as all derivative and related patents, including U.S. Patent No. 10,486,995, to reflect Marco Doda as the joint inventor;

2.    Directing Defendants to take appropriate action to change the inventorship designation on U.S. Patent Application No. 13/169,843 and U.S. Patent No. 8,926,841 and add Marco Doda as an inventor on U.S. Patent Application No. 13/169,843, U.S. Patent No. 8,926,841, and any patents issuing therefrom, including U.S. Patent No. 10,486,995;

3.    Finding that Marco Doda and DODA have an undivided ownership interest in U.S. Patent No. 8,926,841 and any other patents or patent applications claiming priority to U.S. Patent Application No. 13/169,843, including U.S. Patent No. 10,486,995;

4.    Requiring Defendants to disgorge to Plaintiffs all ill-gotten economic benefits they have received from U.S. Patent No. 8,926,841, from derivative patents and patent applications therefrom, including U.S. Patent No. 10,486,995, and from DODA's Confidential Information and proprietary information that they have used and disclosed in violation of the 2010 and 2012 NDAs;

5.    Awarding Plaintiffs damages in an amount to be determined at trial for Defendants' breaches of the 2010 NDA and 2012 NDAs;

6.      Awarding Plaintiffs damages in an amount to be determined at trial for Defendants' breach of the covenant of good faith and fair dealing;

7.      Awarding Plaintiffs punitive and exemplary damages;

8.      Awarding Plaintiffs their costs and disbursements, along with their reasonable attorneys' fees; and

9.      For such other and further relief as this Court deems just and proper.

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Grant D. Fairbairn
Laura L. Myers
FREDRIKSON & BYRON, P.A.
200 South Sixth Street, Suite 4000
Minneapolis, MN  55402-1425
Tel:  (612) 492-7000

Dated:  March 2, 2020
6591908 / 49677

By:   */s/ David E. Moore*
                David E. Moore (#3983)
                Bindu A. Palapura (#5370)
                Stephanie E. O'Byrne (#4446)
                Tracey E. Timlin (#6469)
                Hercules Plaza, 6th Floor
                1313 N. Market Street
                Wilmington, DE  19801
                Tel:  (302) 984-6000
                dmoore@potteranderson.com
                bpalapura@potteranderson.com
                sobyrne@potteranderson.com
                ttimlin@potteranderson.com

*Attorneys for Plaintiffs Marco Doda, DODA USA, Inc., and DODA COSTRUZIONE MACCHINE AGRICOLE, di Doda Aldo e C. snc.*